# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOHN SMITH,                        :
                                      :
         Plaintiff,              :
                                        :         No. 3:09cv458 (MRK)
v.                                     :
                                        :
ANTHONY DA ROS, in his individual     :
capacity and as First Selectman for the    :
Town of Branford; and TOWN OF         :
BRANFORD,                       :
                                        :
         Defendants.            :

## MEMORANDUM OF DECISION

In this case, John Smith, a former employee of the Town of Branford, Connecticut, sues the Town of Branford and Branford's First Selectman, Anthony Da Ros, under both Connecticut General Statutes § 31-51q and 42 U.S.C. § 1983, claiming that the Defendants retaliated against him for exercising his First Amendment rights. Mr. Smith's Complaint [doc. # 1] originally included a federal procedural due process claim as well, but Mr. Smith has "agree[d] to withdraw" that claim. Mem. in Opp'n [doc. # 39] at 35. For the reasons set forth below, the Court GRANTS Defendants' Motion for Summary Judgment [doc. # 31].

### I.

The following facts are taken from the parties' Local Rule 56(a) Statements and from exhibits submitted in connection with the Motion for Summary Judgment. Unless otherwise indicated, the facts are undisputed. The Court will introduce other facts as necessary when it turns to analyze Mr. Smith's claims.

The claims in this case arise out of Mr. Da Ros's termination of Mr. Smith as Facilities

Manager for the Town of Branford ("the Town"). Mr. Da Ros, who is a member of the Democratic Party, is currently First Selectman of the Town's Representative Town Meeting ("RTM"). His current term as First Selectman began in November 2007. He had previously served as First Selectman from 1997 to 2003. From 2003 to 2005, Republican John Opie was First Selectman. From 2005 to 2007, Democrat Cheryl Morris was First Selectwoman.

On June 5, 2007, while Cheryl Morris was First Selectwoman, Mr. Smith was hired as Facilities Manager for the Town, effective June 11, 2007. Mr. Smith was informed that he would report directly to First Selectwoman Cheryl Morris, and that he would be subject to an initial six-month probationary period of employment.

Mr. Smith, Ms. Morris, and Mr. Da Ros are all longtime players in Town politics. For approximately sixteen years, Mr. Smith served as a Democratic member of the RTM. His final two-year term ended in November 2007. Beginning in 2000, Mr. Smith also served as majority leader in the RTM. Mr. Smith met former First Selectwoman Morris in 1997 when she was first elected as an RTM member.

While Mr. Smith was a member of the RTM and when he was majority leader, he and Mr. Da Ros clashed on issues related to conservation and land development. One of those issues involved the acquisition and development of land known as the Queach Property. The other issue was the Town's acquisition by eminent domain of certain property near Tabor Drive ("the Tabor Property"). Although Mr. Smith originally supported the acquisition of the Tabor Property, sometime after the Tabor Property was acquired, Mr. Smith learned that the property was contaminated, and objected to the acquisition. Mr. Smith had at least one "heated conversation" with Mr. Da Ros about the issue during a subsequent lawsuit regarding the acquisition. *See* Defs.' Loc. R. 56(a)1 Statement [doc. # 31-3] ¶ 20; Smith Dep. [doc. # 31-7] at 61:25-62:7.

On several occasions between 2005 and 2007, Mr. Smith criticized Mr. Da Ros and the Town Attorney from Mr. Da Ros's first administration for their handling of the acquisition of the Tabor Property. *See* Da Ros Dep. [doc. # 38-2] 236:24-238:17; Smith Dep. [doc. # 31-10] 213:6-215:22. Mr. Smith voiced his criticisms before the RTM as well as "on a number of occasions" in Democratic Town Committee meetings, and Mr. Smith has affirmed that Mr. Da Ros "was present for most of these discussions." *See* Smith Aff., Ex. 1 to Local R. 56(a)2 Statement [doc. # 38-1] ¶ 27. Mr. Da Ros has testified that prior to his election as First Selectman in 2007, he was aware that Mr. Smith had been critical of his handling of the Tabor Property issue. *See* Da Ros Dep. [doc. # 38-2] 238:17. The local Democratic Party became divided over the land issues, with Mr. Da Ros in one faction, and Ms. Morris and Mr. Smith in another. Because of this upheaval within the party, in the spring of 2007, Mr. Smith was voted out of his position as majority leader, and the party did not re-nominate Ms. Morris for First Selectman. By the summer of 2007, both Mr. Smith and Ms. Morris knew they would not be nominated for additional terms in any capacity. Mr. Smith also knew that Mr. Da Ros would again be a candidate for First Selectman. At the RTM, Democratic Town Committee meetings, and district meetings, Mr. Smith voiced his opinion that Mr. Da Ros was not the right person for the office. In the fall of 2007, Ms. Morris ran for First Selectman as an Independent, and lost to Mr. Da Ros. Mr. Smith actively supported Ms. Morris during her 2007 campaign.

Mr. Smith's net income dropped from $64,000 in 2004 to $0 in 2005 and 2006, according to Mr. Smith's tax returns. In 2006, Mr. Smith was actively seeking employment but received only one job offer as a sales representative for a scaffolding company he had worked at from 1972 to 1979. In July 2006, Mr. Smith approached Ms. Morris about employment with the Town; over the next year, he applied for three different positions with the Town. Mr. Smith was hired as

the Town's Facilities Manager in June 2007.

The parties dispute the circumstances under which Mr. Smith was hired. According to Defendants, Mr. Smith was ultimately hired as the Town's Facilities Manager after recommendations and opinions of the other members of the selection committee were overruled by Ms. Morris. *See* Defs.' R. 56(a)1 Statement [doc. # 31-3] ¶¶ 36-41. The selection committee included three people: Ms. Morris, Janice Plaziak, and Cynthia Coville. Ms. Plaziak's and Ms. Coville's affidavits support Defendants' contention that Mr. Smith was hired by Ms. Morris over their objections. *See* Plaziak Aff. [doc. # 31-31] ¶¶ 11-13; Coville Aff. [doc. # 31-26] ¶¶ 11, 14. Mr. Smith denies Defendants' characterization of the process of his appointment, including Defendants' claims that the other people on the selection committee did not believe Mr. Smith was qualified for the position and did include Mr. Smith among their recommended candidates. *See* Pl.'s Loc. R. 56(a)2 Statement [doc. # 38] ¶¶ 36-40. In support of this denial, Mr. Smith cites the affidavit of Ms. Morris. However, although Ms. Morris and the other committee members disagreed about Mr. Smith's qualifications, none of the paragraphs that Mr. Smith cites from Ms. Morris's affidavit regarding the selection process actually contradict the affirmations of Ms. Plaziak and Ms. Coville, the two other members of the committee. *See* Morris Aff., Ex. 6 to Pl.'s Loc. R. 56(a)2 Statement [doc. # 38-3] ¶¶ 21-23; 32-34.

Mr. Smith's hiring as Facilities Manager in June 2007 was immediately controversial because when he began his job as Facilities Manager for the Town, he was still a member of the RTM. The Town Charter states that "no member of the RTM, except an ex officio member thereof, shall hold any . . . salaried, appointed, or elected office or position of employment [with the state government or Town of Branford]." *See* Charter of the Town of Branford, Ex. 1 to Mot. for Summary Judgment [doc. # 31-4]. The issue of Mr. Smith's dual positions was raised by

another Democratic RTM member at a June 2007 meeting of the RTM. A legal opinion obtained by Ms. Morris suggested that a state law preempted the town regulation. *See* Conn. Gen. Stat. § 7-421(e) (providing that "[a]ny municipal employee shall have the right to serve on any governmental body of the town in which such employee resides except any body which has responsibility for direct supervision of such employee"). An article about the controversy appeared in the *New Haven Independent* on June 19, 2007. *See* Ex. 3-A to Mot. for Summary Judgment [doc. # 31-12]. Although the RTM voted that its administrative services committee should investigate the circumstances of Mr. Smith's hiring and the legal opinion obtained by Ms. Morris, no action was ever taken by that committee.

On November 19, 2007, the day before Ms. Morris left office, she and Mr. Smith signed a favorable performance evaluation of Mr. Smith's work to date. Mr. Smith had himself drafted the form after having done Internet research on how to prepare statements of job goals and objectives.

Mr. Da Ros replaced Ms. Morris as First Selectman on November 20, 2007. In his inaugural address, he promised "no hidden agendas, no self-serving back-room deals, no abuse of power, no cronyism, no bullying." Mark Zaretsky, *'Unk' Da Ros is Back in Branford*, New Haven Register, Nov. 21, 2007, Ex. 3-N to Mot. for Summary Judgment [doc. # 31-25] at 2. Mr. Smith heard this speech and took the reference to "no cronyism" as directed at him and his relationship with Ms. Morris.

Mr. Da Ros was aware that Mr. Smith's hiring had been controversial. During Mr. Da Ros's initial month in office, he communicated with department heads and toured the Town's various facilities, and he began hearing specific complaints regarding Mr. Smith's performance as Facilities Manager. The parties dispute the extent to which Mr. Da Ros was aware of criticism concerning Mr. Smith's hiring, objections to Mr. Smith's dual positions as RTM member and

Facilities Manager through November 2007, and opinions that Mr. Smith was not qualified for the Facilities Manager position. Mr. Smith suggests that there is no evidence that Mr. Da Ros was aware of some of the complaints and controversy regarding Mr. Smith's hiring – namely the positions of Ms. Coville and Ms. Plaziak. *See* Pl.'s Local R. 56(a)2 Statement, Statement of Material Facts in Dispute [doc. # 38] ¶¶ 54-55. However, Mr. Smith does not maintain that Mr. Da Ros was unaware of the public criticism of Mr. Smith's hiring, and he does not dispute that upon taking office, Mr. Da Ros heard at least some complaints about Mr. Smith's performance.

Between November 20 and November 26, Mr. Da Ros conferred with the Town's labor attorney because Mr. Smith's probationary employment period was scheduled to end on December 11, 2007.[1] Article 6(b) of the Town's Personnel Rules and Procedures provides that, upon appointment, a new hire shall be required to successfully complete a probationary period which "shall begin immediately upon original appointment or promotion and continue at least 60 days." Town of Branford Personnel R. and Procedures, Ex. 3-D to Mot. for Summary Judgment [doc. #31-15]. It also provides that the probationary period may be extended for another 30 days if the Department Head thinks a longer working test period is necessary. *Id.* In accordance with Article 6, the Town's attorney prepared a letter to Mr. Smith in which he was advised by Mr. Da Ros that his probationary period was being extended for 30 days until January 9, 2008. *See* Da Ros Aff. [doc. # 31-11] ¶¶ 12-13; Letter from Anthony Da Ros to John Smith of Nov. 26, 2007, Ex. 3-G to Mot. for Summary Judgment [doc. # 31-18]. Mr. Smith does not claim that he objected to the extension of his probationary period at that time.

According to Defendants, complaints regarding Mr. Smith's work continued after Mr. Da

---

[1] Mr. Smith states that he can neither confirm nor deny this fact, but offers no evidence that would controvert Mr. Da Ros's claim that he met with the attorney during that time period. *See* Pl.'s Local R. 56(a)2 Statement [doc. # 38] ¶ 49.

Ros took office. Several of the complaints related to problems with Mr. Smith's oversight of contractors hired to perform work at municipal facilities. *See* Defs.' Loc. R. 56(a)1 Statement [doc. # 31-3] ¶¶ 53-57. In his Local Rule 56(a)2 Statement, Mr. Smith denies that Mr. Da Ros learned of those complaints, but Mr. Smith cites no specific evidence in support of that denial. *See* Pl.'s Loc. R. 56(a)2 Statement [doc. # 38] ¶ 54. Indeed, the evidence in the record supports Defendants' claim. In particular, there is evidence that:

- In her initial report to Mr. Da Ros on Senior Center operations, Dagmar Ridgway, the director of the Town's Senior Center, expressed her "frustration with [Mr.] Smith in completing purchases and projects," including procurement of weather mats and sanding and refinishing of floors at the Center. Ridgway Aff. [doc. # 31-30] ¶¶ 13-21; *see* Da Ros Aff. [doc. # 31-11] ¶ 16.

- Ms. Ridgway complained of Mr. Smith's failure to arrange for ice and snow removal at the Senior Center on two occasions. *See* Ridgway Aff. [doc. # 31-30] ¶¶ 22-24; Da Ros Aff. [doc. # 31-30] ¶ 17; E-mail from Dagmar Ridgway to John Smith, cc'd to Mr. Da Ros, of Dec. 18, 2007, Ex. 5 to Defs.' Loc. R. 56(a)2 Statement [doc. # 38-2]; DeCarlo Aff. [doc. # 31-36] ¶ 11.

- Ms. Plaziak expressed concerns about Mr. Smith's attempt to install a backup generator outside City Hall without prior authorization; she was concerned in particular about the size of the proposed generator and the noise it would produce. *See* Da Ros Aff. [doc. # 31-11] ¶ 22; Plaziak Aff. [doc. # 31-31] ¶ 14.[2]

- Mr. Da Ros also received a complaint about Mr. Smith's installation of the generator from the minister of the church immediately next door to Town Hall. *See* Da Ros Aff. [doc. # 31-11] ¶23.

---

[2] In his Memorandum in Opposition [doc. # 39], Mr. Smith claims that "[Mr.] Da Ros . . . testified that he never spoke to [Ms.] Plaziak about [Mr.] Smith's performance prior to his discharge and that she never complained about [Mr.] Smith's performance." Mem. in Opp'n [doc. # 39] at 26 (citing Da Ros Dep. [doc. # 38-2] at 173-175). Mr. Da Ros actually testified that he did not have conversations with Ms. Plaziak that were "so much specific to Mr. Smith," Da Ros Dep. [doc. # 39] 174:1-2. While Mr. Da Ros stated, when asked whether Ms. Plaziak ever complained to him about Mr. Smith's performance, "She didn't complain to me," *id.* at 174:21, the deposition transcript pages cited by Mr. Smith do suggest that Mr. Da Ros communicated with Ms. Plaziak about projects that Mr. Smith was involved in and concerns related to those projects. Regardless, Mr. Da Ros's affidavit does not contradict the isolated statement in Mr. Da Ros's deposition that Ms. Plaziak did not "complain" about Mr. Smith, *per se*.

- Ms. Plaziak reported that Mr. Smith failed to ensure that a permit had been obtained by the contractor before commencement of drilling through Town Hall walls for electrical conduits; Ms. Plaziak had ordered the drilling stopped because no permit had been obtained. *See* Da Ros Aff. [doc. # 31-11] ¶ 22; Plaziak Aff. [doc. # 31-31] ¶ 14.

- Fire Chief John Ahern complained about a problem with the ventilation of diesel fumes at the fire station, and he indicated that Mr. Smith's intervention had not corrected the problem. *See* Da Ros Aff. [doc. # 31-11] ¶ 26; *see also* Smith Dep. [doc. # 31-8] at 97:10-24 (describing the "issue[s] with the fire department" that Mr. Smith was aware of).

- Police Chief John De Carlo communicated to Mr. Da Ros frustrations related to Mr. Smith's involvement in a project to complete a new police firing range. *See* Da Ros Aff. [doc. # 31-11] ¶ 24; De Carlo Aff. [doc. # 31-36] ¶¶ 7-11.

According to Defendants, on December 17, 2007, on one of the mornings on which the Town's Senior Center was inaccessible due to ice, Mr. Da Ros arrived at Town Hall to find two employees chipping at ice in an effort to clear the entry. *See* Defs.' Local R. 56(a)1 Statement [doc. # 31-3] ¶ 58. Also according to Defendants, those employees reported that they had been instructed by Mr. Smith not to clear the ice the night before because the weather was supposed to get warmer. *See id.*; Da Ros Aff. [doc. # 31-11] ¶ 18.[3] That same morning, OSHA conducted unannounced site inspections at Town Hall, the Recreation Department, the Public Works Department and the Transfer Station. Numerous deficiencies in the Town's OSHA compliance were identified, including that Town Hall emergency egress doors were frozen shut at the time of the inspection. Mr. Da Ros claims that Mr. Smith was responsible for OSHA compliance, *see* Defs.' Local R. 56(a)1 Statement [doc. # 31-3] ¶ 60, and at his deposition, Mr. Smith acknowledged that OSHA compliance was one of his responsibilities. *See* Smith Dep. [doc. # 31-10] at 176:13-19.

---

[3] Mr. Smith denies those claims. *See* Pl.'s Loc. R. 56(a)2 Statement [doc. # 38] ¶58. However, Mr. Smith cites as evidence only his own affidavit, and, in fact, his affidavit does not contradict Mr. Da Ros's account of his visit to Town Hall on December 17, 2007. *See* Smith Aff. [doc. # 38-1] ¶¶ 75-77.

According to Defendants, after the OSHA inspection, Mr. Da Ros requested a report on outstanding issues or deficiencies at Town Hall and the Police and Fire Departments, and the report that was then produced itemized multiple facility defects at those locations. *See* Defs.' Local R. 56(a)1 Statement [doc. # 31-3] ¶ 60. Mr. Smith denies those claims, but cites no specific evidence in support of his position. *See* Pl.'s Local R. 56(a)2 Statement [doc. # 38] ¶ 60. Mr. Smith himself has submitted a copy of a memorandum from one Gale Plancon to Mr. Da Ros that itemized the results of the OSHA inspection. *See* Memorandum from Gale Plancon to Anthony Da Ros, Jan. 2, 2008, Ex. 16 to Pl.'s Local R. 56(a)2 Statement [doc. # 38-4] at 11.

Additionally, Defendants claim that during Mr. Da Ros's first month in office, Mr. Da Ros personally inspected deficient work for which Mr. Smith was responsible, including such examples as poor quality sanding and urethane application to the floors of the Senior Center; installation of ill-fitting replacement weather mats at the Senior Center; ruined laminate floors that had been improperly sanded at Town Hall; and an effort to provide air circulation to the Town Hall boilers that was implemented without input from a qualified heating contractor. *See* Defs.' Local R. 56(a)1 Statement [doc. # 31-3] ¶55. The claim that Mr. Da Ros inspected work for which Mr. Smith was responsible and observed those deficiencies is supported by Mr. Da Ros's affidavit. *See* Da Ros Aff. [doc. # 31-11] ¶¶ 16, 22, 25, 27. Mr. Smith denies that Mr. Da Ros personally inspected deficient work for which Mr. Smith was responsible. *See* Pl.'s Local R. 56(a)2 Statement [doc. # 38] ¶ 55. However, no evidence in the record sheds doubt on Mr. Da Ros's affirmation that he inspected projects for which Mr. Smith was responsible and observed the deficiencies detailed in his affidavit.

On December 28, 2007, Mr. Da Ros sent Mr. Smith a termination letter, explaining how he had come to the conclusion that Mr. Smith's "job performance as Facilities Manager ha[d] not been

satisfactory." *See* Letter from Anthony Da Ros to John Smith, Dec. 28, 2007, Ex. 3-L to Mot. for Summary Judgment [doc. # 31-23]. On January 9, 2008, Mr. Smith sent a letter to Mr. Da Ros, notifying him that Mr. Smith was "requesting an appeal of [his] 'separation' from the Town of Branford" under Article 9, Section 7 of the Town's Personnel Rules and Procedures. *See* Letter from John Smith to Anthony Da Ros, Jan. 9, 2008, Ex. 3-M to Mot. for Summary Judgment [doc. # 31-24] at 2. In his letter, Mr. Smith also requested "a meeting with the First Selectman according to Article 10 Section 3." *See id.* Mr. Da Ros later responded to the letter, informing Mr. Smith that his letter of January 9, 2008 was received on January 17, 2008; that as a probationary employee, Mr. Smith did not have a right to appeal the termination decision; and that even if Mr. Smith did have a right to appeal, his letter was received more than five days past the date of separation. *See* Letter from Anthony Da Ros to John Smith, Jan. 23, 2008, Ex. 3-M to Mot. for Summary Judgment [doc. # 31-24] at 3. Under Town Regulations, requests to appeal disciplinary actions must be submitted in writing to the First Selectman within five working days of the date the action was taken. Following Mr. Smith's termination, the responsibilities of Facilities Manager were divided between a tradesperson, Otto Berger, and Ms. Plaziak, the Town Engineer.[4]

---

[4] Mr. Smith claims that Mr. Berger took over all of Mr. Smith's Facilities Manager responsibilities, citing Mr. Berger's deposition. *See* Pl.'s Local R. 56(a)2 Statement, Statement of Material Facts in Dispute [doc. # 38] ¶ 77. But Mr. Berger testified that after Mr. Smith's discharge, he took on most of Mr. Smith's responsibilities, and Ms. Plaziak "did the General Government buildings budget" for the 2008-2009 fiscal year – though Mr. Berger took on the budget for the next fiscal year. *Id.* at 43. While Mr. Smith also has submitted evidence that as of July 15, 2010, Mr. Berger was listed as the municipal department manager for "General Government Buildings," *see* Ex. 24 to Pl.'s Local R. 56(a)2 Statement [doc. # 38-4] at 50, that evidence does not contradict Mr. Berger's testimony about the division of responsibilities following Mr. Smith's discharge. Regardless, since there is no allegation that Mr. Smith was replaced with a crony of Mr. Da Ros, and Defendants do not maintain that Mr. Smith was fired because the Town decided to eliminate the Facilities Manager position, the question of whether all

Mr. Smith takes issue with many of the details of the complaints regarding his performance as Facilities Manager. For example, in his affidavit, he points out that when Ms. Ridgway told him the floor mats at the Senior Center were the wrong size, he had the mats cut to fit, and never heard any further complaints. *See* Smith Aff., Ex. 1 to Pl.'s Loc. R. 56(a)2 Statement [doc. # 38-1] ¶¶ 52-53. In addition, Mr. Smith suggests that other individuals contributed to the problems involving the new police firing range and ventilation at the fire station. *See id.* ¶¶ 58-65. He also attempts to minimize the complaints Mr. Da Ros allegedly received from the minister regarding the generator at the Town Hall by contending that he had communicated with the minister regarding the project prior to the installation, and received no response from him. *See id.* ¶ 55. Furthermore, Mr. Smith has affirmed that it was not "[his] fault" that the contractor had started working on the project without a permit. *Id.* ¶ 56. In his affidavit, Mr. Smith also notes that he immediately addressed many of the OSHA violations, and claims that, contrary to Defendants' contention, the fine paid by the Town was "not substantial." *Id.* ¶¶ 78-83. Finally, Mr. Smith claims that Mr. Da Ros did not discuss any of the specific complaints or worries regarding Mr. Smith's job performance with Mr. Smith prior to his termination. *See* Pl.'s Local R. 56(a)2 Statement, Statement of Material Facts in Dispute [doc. # 38] ¶ 45; Smith Aff., Ex. 1 to Pl.'s Local R. 56(a)2 Statement [doc. # 38-1] ¶ 45. Defendants have not disputed that particular claim.

## II.

The standard of review this Court must apply when reviewing a motion for summary judgment pursuant to Rule 56 is a familiar one. Summary judgment is appropriate only when "the

---

or some of his responsibilities were assigned to Mr. Berger is not material. *Cf. Vezzetti v. Pellegrini*, 22 F.3d 483, 487 (2d Cir. 1994) (distinguishing between a defendant who fires an employee in order to replace him with a political "stalwart" and a defendant who eliminates the plaintiff's position altogether).

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[5] "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica College of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (alteration in the original)).

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the non-moving party, *see Anderson*, 477 U.S. at 255. If the moving party carries its burden, the party opposing summary judgment may not rely on mere allegations or denials, but rather must "cit[e] to particular parts of materials in the record" to demonstrate that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to [demonstrate that a fact is genuinely disputed] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In short, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Furthermore, "[i]f the evidence is merely colorable, or is not significantly probative, summary

---

[5] The wording and structure of Rule 56 of the *Federal Rules of Civil Procedure* changed as of December 1, 2010, but there was no change in the substantive standard for summary judgment.

12

judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III.

In his § 1983 First Amendment claim, Mr. Smith asserts that he was retaliated against both on the basis of his protected speech, and on the basis of his political affiliation.

To establish a *prima facie* case of First Amendment retaliation, a plaintiff alleging that he was terminated on the basis of his speech must show (1) that his speech was constitutionally protected, (2) that he suffered an adverse employment decision, and (3) that a causal connection existed between his speech and the adverse employment determination against him. *See Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999). A causal connection exists only if the plaintiff's speech was "at least a substantial or motivating factor in the adverse employment action." *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003) (quotation marks, alteration, and citation omitted). If a plaintiff produces sufficient evidence to support this initial showing, a government employer may still avoid liability in two different ways. First, the employer may show by a preponderance of evidence "that it would have taken the same adverse action in the absence of the protected speech." *Mandell v. County of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003). Second, applying the balancing test set out by the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563 (1968), the employer may demonstrate that the plaintiff's speech "was likely to disrupt the government's activities, and the likely disruption was sufficient to outweigh the First Amendment value of [the] plaintiff's speech." *See id.* at 382-83. In addition, "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to his official responsibilities." *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006).

The analysis of claims of retaliation on the basis of political affiliation differs slightly from the analysis in cases alleging speech-based retaliation. In *Elrod v. Burns*, 427 U.S. 347 (1976) and

*Branti v. Finkel*, 445 U.S. 507 (1980), the Supreme Court recognized an exception to the general First Amendment prohibition against discrimination on the basis of political affiliation. Those decisions established that "[g]overnment officials may not discharge public employees for refusing to support a political party or its candidates, unless political affiliation is a reasonably appropriate requirement for the job in question." *O'Hare Truck Serv. v. City of Northlake*, 518 U.S. 712, 714 (1996). Therefore, a court evaluating a claim that a government employee was discharged in retaliation for his or her political affiliation in violation of the First Amendment must determine whether the position from which the employee was discharged was "one in which political affiliation [was] a legitimate factor to be considered." *Branti*, 445 U.S. at 518. As the Second Circuit has explained, "political affiliation is an appropriate [job] requirement when there is a rational connection between shared ideology and job performance." *Morin v. Tormey*, 626 F.3d 40, 45 (2d Cir. 2010) (quoting *Savage v. Gorski*, 850 F.2d 64, 68 (2d Cir. 1988)).

When political affiliation is not "an appropriate requirement for effective performance of the public office involved," *Branti*, 445 U.S. at 518, the standard applied to a claim of retaliation on the basis of political affiliation is virtually indistinguishable from the standard for speech-based retaliation. The plaintiff must prove (1) that he engaged in constitutionally protected conduct, (2) that he suffered an adverse employment action, and (3) that his protected conduct was a substantial or motivating factor leading to the adverse employment action. *See Cotarelo v. Sleepy Hollow Police Dep't*, 460 F.3d 247, 253 (2d Cir. 2006). However, the government employer does not get the benefit of the *Pickering* balancing test that applies in speech-based retaliation cases. *See Morin*, 626 F.3d at 43-44; *see also Melzer v. Bd. of Educ.*, 336 F.3d 185, 195 (2d Cir. 2004) (distinguishing the "heightened protection" given to partisan political conduct from the balancing test applied in cases of "non-partisan associational activity [that] involves speech"). Rather, if the

employee demonstrates by a preponderance of evidence that the employee's political affiliation was a substantial or motivating factor in the employer's decision to take adverse action against the employee, the employer will prevail only if it demonstrates by a preponderance of evidence that it would have taken the same action regardless of the employee's protected political conduct. *See Coogan v. Smyers*, 134 F.3d 479, 484 (2d Cir. 1998).

## III.

### A.

The Court first considers whether Mr. Smith engaged in activities protected by the First Amendment.

Mr. Smith maintains, and Defendants do not dispute, that in 2006 and 2007, Mr. Smith publicly criticized Mr. Da Ros's handling of issues related to the Tabor Property seizure during Mr. Da Ros's first term as First Selectman. The First Amendment protects a public employee from retaliation based on the employee's speech only if the employee "spoke as a citizen on a matter of public concern." *Anemone v. Metro Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011). The parties dispute whether Mr. Smith's comments on the Tabor Property issue constituted speech protected by the First Amendment. Defendants do not dispute that Mr. Smith's speech related to the Tabor Property seizure addressed a matter of public concern. Defendants argue, though, that Mr. Smith engaged in his allegedly protected speech pursuant to his role as Town Selectman, and hence, that he was not speaking as a citizen but rather as a public official. Mr. Smith argues that he made at least some of the comments not in his capacity as Town Selectman, but as a private citizen.

"[W]hen public employees make statements pursuant to their official duties," they "are not speaking as citizens for First Amendment purposes" because the public employer may "exercise control over what the employer itself has commissioned or created." *Garcetti*, 547 U.S. at

15

421-22.   Taking the evidence in the light most favorable to Mr. Smith – as it must – the Court is not convinced that Mr. Smith's comments regarding the Tabor Property seizure at Democratic Town Committee meetings while he was a Town Selectman would constitute protected speech, *if the job from which Mr. Smith claims he was unlawfully terminated were the position of Town Selectman.   See id.* at 424.   However, Mr. Smith is not claiming he was unlawfully discharged from his position as Town Selectman on the basis of comments he made during his tenure as Town Selectman, but rather that he was unlawfully discharged from his job as the Town's Facilities Manager because of speech he engaged in before he assumed that position.   The Court thus will assume, *without deciding*, that Mr. Smith's criticisms of Mr. Da Ros's handling of the Tabor Property seizure constituted speech protected by the First Amendment.[6]

Under Second Circuit precedent, Mr. Smith's alignment with Ms. Morris in town politics and his opposition to Mr. Da Ros during Mr. Da Ros's second campaign for First Selectman are categorized as political affiliation rather than speech for First Amendment purposes.   *See Gronowski v. Spencer*, 424 F.3d 285, 292 (2d. Cir. 2005) (explaining that the plaintiff "engaged in activity protected under the First Amendment when she supported [a particular candidate's] political campaigns," and that her termination on that basis would not be constitutional because "the Mayor and the City [did] not assert that party affiliation [was] pertinent to the City Clerk position from which [the plaintiff] was fired"); *McEvoy v. Spencer*, 124 F.3d 92, 100 (2d. Cir.

---

[6] In his brief in opposition to summary judgment, Mr. Smith states that he and Mr. Da Ros also clashed over the Queach Property issue "shortly after Cheryl Morris' election [in 2005]," when Mr. Smith was Majority Leader of the RTM.   *See* Mem. in Opp'n [doc. # 39] at 4.   However, Mr. Smith's brief does not argue that his remarks during debates and discussions about the Queach Property constituted speech protected by the First Amendment, or that Mr. Da Ros retaliated against Mr. Smith in violation of the First Amendment because of comments related to the Queach Property controversy. *See id.* at 19. In support of his claim that his speech "involved matters of public concern and was constitutionally protected," Mr. Smith discusses only his criticism of the first Da Ros administration's "handling of the Tabor land seizure." *See id.*

1997) (explaining that to determine whether the *Pickering* balancing test is applicable, the Second Circuit has distinguished between "expressive activity unrelated to a political contest" and "partisan political conduct or affiliation" (citation and quotation marks omitted)).  To the extent that Mr. Smith's claim is based on allegations that he was dismissed from the Facilities Manager position because of his political affiliation with Ms. Morris and his opposition to Mr. Da Ros in the 2007 First Selectman campaign, his political involvement would also constitute activity protected under the First Amendment – so long as the Facilities Manager job is not a position for which "political affiliation is an appropriate requirement."  *Savage*, 850 F.2d at 68.

Neither Mr. Smith nor Defendants have argued that political affiliation or political loyalty was an appropriate requirement for the Facilities Manager position.  However, Defendants argue that whether or not political affiliation was a legitimate criterion for Ms. Morris to take into consideration when she hired Mr. Smith for the position, Mr. Smith's political loyalty to Ms. Morris *was* the definitive factor in Ms. Morris's decision to hire Mr. Smith, effectively transforming the Facilities Manager job into a patronage position.  *See* Mem. in Supp. [doc. # 31-1] at 18.  Even if Mr. Smith's hiring as Facilities Manager constituted a patronage appointment to a position for which political loyalty was not a relevant requirement, though, that patronage appointment would not provide a justification for a patronage dismissal.  As the Second Circuit has stated, "a history of past patronage, even if a source of benefit to the plaintiff, does not render the practice constitutional."  *Coogan*, 134 F.3d at 484 (noting that even if the "City Clerk's position was historically one of political patronage and . . . [the plaintiff] himself was a patronage appointment," those facts would not justify dismissal of the plaintiff on the basis of his politics).  In other words, Ms. Morris's alleged decision to appoint Mr. Smith because of Mr. Smith's political affiliation rather than Mr. Smith's qualifications would not give Mr. Da Ros

17

license to fire Mr. Smith because of Mr. Smith's political affiliation, rather than his qualifications. *See Vezzetti v. Pellegrini*, 22 F.3d 483, 487 (2d Cir. 1994).

Because no party contends that political affiliation was an appropriate requirement for the Facilities Manager job, the Court finds that Mr. Smith's political affiliation with Ms. Morris and his partisan political conduct during the 2007 First Selectman campaign were activities protected under the First Amendment, and not subject to the *Branti/Elrod* exception. *See Morin*, 626 F.3d at 44-45.

**B.**

The Court next considers whether the retaliatory actions alleged by Mr. Smith constituted adverse employment actions. In the First Amendment context, "[a]n employment action is 'adverse' if it 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Krukenkamp v. State Univ. of N.Y.*, 395 F. App'x 747, 749 (2d Cir. 2010) (summary order) (citation omitted). "In this context, 'adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand.'" *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006) (citation and alteration omitted). That list is not exhaustive, however, and "lesser actions may also be considered adverse employment actions." *Id.* For the Court's determination of whether an alleged act of retaliation rises to the level of an adverse employment action, "[c]ontext matters," since "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships." *Burlington Northern & Santa Fe Rwy. v. White*, 548 U.S. 53, 69 (2006) (citation omitted) (defining the standard for adverse employment actions in the Title VII retaliation context); *Zelnik*, 464 F.3d at 227 ("[The Second Circuit's] standard for First Amendment retaliation claims has always been the equivalent to the standard set forth in *Burlington*

*Northern*.").

There is no question that Mr. Smith's termination on December 28, 2007 constituted an adverse employment action. *See Zelnik*, 464 F.3d at 226. Mr. Smith alleges, however, that the Defendants first retaliated against him in violation of the First Amendment when they extended Mr. Smith's probationary period of employment in late November 2007. In some circumstances, the extension of a probationary period of employment might constitute an action severe enough to deter an individual of ordinary firmness from exercising his constitutional rights, for example, if it represented a violation of regulations limiting the length of time for which an employee could remain employed on a probationary status. *See Guilloty Perez v. Pierluisi*, 339 F.3d 43, 49 n.3, 57 (1st Cir. 2003) (assuming, on consideration of a motion for summary judgment, that negative performance evaluations and extension of an employee's probationary status three years longer than allowed by Justice Department regulations constituted adverse employment actions in the First Amendment retaliation context).[7] Mr. Smith claims that Mr. Da Ros "improperly" extended Mr. Smith's probationary period in violation of Town personnel rules that "explicitly limited the

_____

[7] In addition, where a plaintiff who is a permanent employee suffers a change in his employment status – rather than having his existing probationary status extended – courts have held that the imposition of probation may constitute an adverse employment action. *See, e.g.*, *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 85, 89 (2d Cir. 1996) (explaining, in a Title VII discrimination case, that the plaintiff's identification of evidence that "showed that the defendant engaged in a continuing course of conduct of taking adverse employment actions against her, beginning with negative performance evaluations, continuing with pre-probation and probation status, and ending in [an] announced intention to terminate her employment" could support a showing that the plaintiff suffered an actual discharge); *see also Griffin v. New York*, 122 F. App'x 533, 534 (2d. Cir. 2004) (summary order) (suggesting that in *Chertkova*, the Second Circuit "recogniz[ed] such actions [as placement on probation] as adverse employment actions in the Title VII context"); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) (holding that placement of the plaintiff on a 90-day "performance plan" following a disciplinary investigation constituted an adverse employment action in the Title VII retaliation context). However, because the action Mr. Smith complains of did not change his employment status, those cases are inapposite.

probation to a maximum of 90 days."   Mem. in Opp'n [doc. # 39] at 25.   During oral argument, Mr. Smith's counsel again represented that the maximum length for a probationary period of employment under town regulations was 60 days, with one 30-day extension.

There is no support for counsel's assertion.   Indeed, the claims by Mr. Smith and his counsel are directly contradicted by the unambiguous language in Article 6 of the Town's personnel regulations:

> Every person . . . appointed to a new position shall be required to complete successfully a probationary period . . . .  The probationary period shall begin immediately upon original appointment . . . and continue for *at least* 60 days.   The probationary period may be extended for another 30 days if the Department Head thinks a longer working test period is necessary in order to determine whether the employee should be retained in the position.

Town of Branford Personnel Rules & Procedures, Ex. 3-D to Mot. for Summary Judgment [doc. # 31-15] at 17 (emphasis added).   Since Mr. Smith's original six-month probationary period was "at least 60 days," and since Mr. Da Ros extended that period by 30 days, Mr. Da Ros did not violate the Town's personnel rules when he extended the probationary period.   Moreover, the extension of Mr. Smith's probationary status did not entail any "negative consequences," *Dillon v. Morano*, 497 F.3d 247, 255 (2d Cir. 2007), but rather merely preserved the existing terms of his employment.   Therefore, no reasonable jury could find that the extension of Mr. Smith's probationary period of employment constituted an adverse employment action.

### C.

The third issue the Court must consider is whether Mr. Smith has presented evidence sufficient to support a reasonable jury finding that Mr. Smith's protected speech or political affiliation was a substantial or motivating factor in the decision to discharge Mr. Smith from the Facilities Manager position.

A plaintiff alleging retaliation on the basis of his speech or political affiliation "bears the initial burden of showing that an improper motive played a substantial part in the defendant's action." *Anemone*, 629 F.3d at 114 (citation omitted). To demonstrate such a causal connection between protected First Amendment activity and an adverse employment action, the plaintiff must offer more than "conclusory assertions of retaliatory motive." *Deters v. Lafuente*, 368 F.3d 185, 190 (2d Cir. 2004). Rather, the plaintiff "must aver some tangible proof demonstrating that [the] protected [activity] animated [the adverse employment decision]." *Washington v. County of Rockland*, 373 F.3d 310, 321 (2d Cir. 2004). A plaintiff may establish causation "either indirectly by means of circumstantial evidence, for example, by showing the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Morris*, 196 F.3d at 110.

Mr. Smith argues that there are several bases on which a reasonable jury could conclude that Mr. Smith was terminated in retaliation for his protected speech and/or his political affiliation with Ms. Morris: Mr. Smith's protected activities occurred close in time to his discharge from the Facilities Manager position; Mr. Smith was treated differently than other, similarly situated employees; Mr. Da Ros's stated justification for discharging Mr. Smith was pretextual; and Mr. Da Ros's inaugural address included a statement constituting direct evidence that Mr. Smith's discharge was politically motivated. *See* Mem. in Opp'n [doc. # 39] at 23-35. Defendants argue that the statement in Mr. Da Ros's inaugural address is not evidence that Mr. Smith was discharged on account of his political affiliation; that there is no temporal proximity that would support an inference of retaliation; that the activity that Mr. Smith alleges was the basis for his discharge could not plausibly fuel subsequent retaliation; that Mr. Da Ros's decision to terminate Mr. Smith was based on evidence of deficiencies in Mr. Smith's job performance; that Mr. Smith cannot

demonstrate that the proffered reasons for his dismissal were merely pretextual; and that Mr. Smith has produced no evidence that he was treated differently from similarly situated employees. *See* Mem. in Supp. [doc. # 31-1] at 21-28, 33-34; Reply to Mem. in Opp'n [doc. # 42] at 4-7. The Court ultimately agrees with Defendants that the evidence on record would not support a finding by a reasonable jury that Mr. Smith's protected activities were a substantial or motivating factor in his discharge. The Court will address each of Mr. Smith's arguments in the sections that follow.

**1.**

Mr. Smith's argument that the timing of his discharge is evidence sufficient to establish that his protected activities were a substantial or motivating factor in his termination relies on precedent holding that temporal proximity may support an inference of causation in cases alleging unlawful retaliation. The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (quoting *Gorman-Bakos v. Cornell Co-op Extension*, 252 F.3d 545, 554 (2d Cir. 2001)). The court has thus been able "to exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Id.* However, as the Supreme Court has observed, "[t]he cases that accept mere temporal proximity . . . as sufficient evidence of causality to establish a prima facie case [of unlawful retaliation] uniformly hold that the temporal proximity must be 'very close.'" *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001). Indeed, district courts within the Second Circuit consistently have found that lapses of more than two or three months between protected activity and allegedly retaliatory actions do not support inferences of causation. *See Murray v. Visiting Nurse Servs.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (collecting cases); *see also, e.g.*,

*Alam v. HSBC Bank USA*, 382 F. App'x 74, 75 (2d Cir. 2010) (summary order) (affirming district court's conclusion that a gap of four months between the plaintiff's protected activity and his termination was too wide to establish a causal nexus).

Moreover, Second Circuit precedent makes clear that the relevance of temporal proximity to the question of whether there is a "causal nexus" between a plaintiff's protected activity and the defendant's allegedly retaliatory action will depend on the facts and circumstances of each particular case. *See, e.g.*, *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005) (weighing timing and other factors relevant to the "causal nexus" question in the First Amendment retaliation context); *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (finding that temporal proximity did not suggest a causal nexus in a Title VII retaliation case). Thus, mere temporal proximity – even very close temporal proximity – is not always sufficient to support an inference that the plaintiff's protected activity was a motivating factor in the defendant's adverse employment action. *See, e.g.*, *Anemone*, 629 F.3d at 118 n.12 (finding "no indication" that the plaintiff's testimony before the New York State Assembly on April 11, 2003 "played any role in the decision to terminate [the plaintiff]" less than a month later, on May 8, 2003). For example, mere temporal proximity between an employee's protected activity and a subsequent adverse employment action will not support an inference of a causal connection where the employer had already begun taking adverse employment actions against the employee prior to the employee's engagement in any protected activity. *See, e.g.*, *Porter v. Potter*, 366 F. App'x 195, 197 (2d Cir. 2010) (summary order) ("Adverse employment actions that are part of an 'extensive period of progressive discipline' that begins prior to any protected activity on the plaintiff's part cannot give rise to an inference of retaliation sufficient to make out a prima facie case [of Title VII retaliation]." (quoting *Slattery*, 248 F.3d at 95)). At the

23

same time, even a somewhat longer passage of time between protected activity and an allegedly retaliatory action may be consistent with an inference of causation where the timing of the action, in combination with other case-specific facts, suggests a causal nexus. *See Espinal*, 558 F.3d at 129-30 (holding that the passage of six months between a prisoner's protected activity and prison guards' alleged beating of the prisoner was "sufficient to support an inference of a causal connection" where it was "plausible that the officers waited to exact their retaliation at an opportune time – as when Espinal was involved in a fight with another inmate").

In this case, Mr. Smith argues that the timing of his discharge from the Facilities Manager position supports both an inference that the Defendants retaliated against him on the basis of his speech, and an inference that the Defendants retaliated against him on the basis of his political affiliation. However, for the reasons that follow, the Court finds that the timing of Mr. Smith's discharge is not evidence sufficient to support a reasonable jury finding that Mr. Smith's speech or political affiliation was a substantial or motivating factor in the adverse employment action.

**a.**

First, Mr. Smith argues that he can establish a causal connection between his termination and his criticisms of Mr. Da Ros's handling of the Tabor Property seizure because his "protected activity was close in time to the adverse action," given that he "spoke out against [Mr. Da Ros] in 2005-2007." *See* Mem. in Opp'n [doc. # 39] at 24.

From the affidavits, deposition testimony, and all the other evidence in the record, it is unclear when, exactly, Mr. Smith voiced his criticisms of Mr. Da Ros's handling of the Tabor Property issue. At his deposition, Mr. Da Ros testified that Mr. Smith voiced those criticisms in 2005 and 2006. *See* Da Ros Dep. [doc. # 38-2] at 237:3. At Mr. Smith's deposition, Mr. Smith testified that he criticized the first Da Ros administration's handling of the Tabor Property issue on

many occasions between 2005 and 2007. *See* Smith Dep. [doc. # 31-10] at 212:20-213:9, 214:13-20, 215:1-4. In addition, Mr. Smith has affirmed that he made all of the comments at issue "before [Mr.] Da Ros was elected as First Selectman in [November] 2007," and "[n]early all of" them "before [he] was hired as Facilities Manager" in June 2007. Smith Aff. [doc. # 38-1] ¶ 28. That evidence, taken in the light most favorable to Mr. Smith, leaves open the possibility that some of Mr. Smith's protected speech occurred within two or three months of his discharge from the Facilities Manager position. Nonetheless, it is insufficient to create a genuine issue of material fact.

Not only has Mr. Smith failed to identify specific dates on which he criticized Mr. Da Ros – the time periods in which he engaged in his protected speech remain vague – he also has not specified exactly what he said when he engaged in his protected speech.[8] A jury relying on the evidence in the record would be forced to speculate about when Mr. Smith's protected speech occurred and, since Mr. Smith does not allege any specific statements, what exactly Mr. Smith said. Because a party opposing summary judgment cannot demonstrate the existence of a genuine issue of material fact with "evidence that gives rise to mere speculation and conjecture," *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005), no reasonable jury could conclude that Mr. Smith's criticisms of the first Da Ros administration's handling of the Tabor Property seizure were a substantial or motivating factor in Mr. Smith's discharge from the Facilities Manager position. *Cf. Pavone v. Puglisi*, 353 F. App'x 622, 625 (2d Cir. 2009) (summary order)

---

[8] To the extent that Mr. Smith's claim that Mr. Da Ros retaliated against him because of Mr. Smith's criticisms of the first Da Ros administration's handling of the Tabor Property seizure is an allegation that Mr. Da Ros retaliated against Mr. Smith because of Mr. Smith's political activity in opposition to Mr. Da Ros, that claim merges with Mr. Smith's claim of retaliation on the basis of political affiliation. *See, e.g.*, *Lewis v. Cowan*, 165 F.3d 154, 162 (distinguishing between a discharge "based on discrete incidents of speech" and a discharge based on "political affiliation").

(holding that "[w]ithout further allegations regarding the nature and timing of [the plaintiffs'] speech, the [defendant's] awareness of the speech, or other facts sufficient to support an inference that protected conduct played a role in the alleged adverse actions taken against [the plaintiffs], [the p]laintiffs [had] not sufficiently pleaded a claim of retaliation," despite the fact that the time period at issue, when calculated "in the manner most favorable to the [p]laintiffs," was "a time short enough to infer causality in some cases" (citations omitted)).

**b.**

Second, Mr. Smith argues that the timing of his discharge supports an inference of retaliation on the basis of political affiliation because Mr. Smith opposed Mr. Da Ros in the 2007 election – which Mr. Da Ros won in November 2007 – and Mr. Smith was discharged barely one month later, on December 28, 2007.  *See* Mem. in Opp'n [doc. # 39] at 24.

It is true that taken in the light most favorable to Mr. Smith, the evidence shows that Mr. Smith actively supported Ms. Morris in her campaign for First Selectman, which concluded in November 2007, and Mr. Smith was terminated as Facilities Manager in December 2007. However, as noted already, and as other courts in this District have observed, "[t]emporality alone . . . may not be sufficient to show retaliation by an employer," because "'[t]he operative issue is not simply the length of time between the protected activity and the alleged retaliation, but the demonstrated nexus between the two.'"  *See Harp v. DeStefano*, No. 03cv977 (CFD), 2007 WL 2869831, at *7 (D. Conn. Sept. 27, 2007) (quoting *Oliphant v. Conn. Dep't of Transp.*, No. 02cv700 (PCD), 2006 WL 3020890, at *10 (D. Conn. Oct. 23, 2006)). The Court has found no Second Circuit decision in which the court concluded that temporal proximity between protected activity and an adverse employment action constituted evidence sufficient to support an inference of retaliation on the basis of political affiliation.

Rather, in cases alleging retaliation on the basis of political affiliation in which the Second Circuit has found explicitly that the plaintiff presented evidence of causation sufficient to survive summary judgment, the plaintiff had presented either direct evidence of retaliatory animus or circumstantial evidence that the employer took adverse action only against his political opponents or favored his political supporters. For example, in *Gronowski v. Spencer*, 424 F.3d 285 (2d Cir. 2005), the court concluded that the plaintiff had presented evidence sufficient for a reasonable jury to find retaliation on the basis of political affiliation because: (1) the plaintiff testified that that prior to her involvement in the campaign of a political opponent of the defendant mayor, the defendant "greeted her with a 'kiss on the cheek, a handshake, how are you," but that these warm greetings ceased after she became active in the campaign; and (2) the plaintiff testified that one of the defendant's aides told her the mayor "was furious with her on account of her political activities." *Id.* at 294. In *Vezzetti v. Pellegrini*, 22 F.3d 483, the court found that there was a genuine issue of material fact as to whether political affiliation was a motivating factor in one plaintiff's termination because (1) the plaintiff had testified that a defendant had told the plaintiff that "[h]e liked [him] personally, but he had to [go after the plaintiff and his job]," because of the plaintiff's party affiliation and association with a former Republican official; and (2) the defendants claimed that the plaintiff's termination was the result of budget cutbacks, but the only two jobs eliminated by the budget "were held by members of opposition parties." *Id.* at 488. Because political affiliation, unlike speech, usually does not consist of discrete acts, *see, e.g.*, *Lewis*, 165 F.3d at 162, it makes sense that timing alone is generally insufficient to demonstrate a causal nexus between an adverse employment action and a plaintiff's support for a particular political candidate or faction.

In this case, the 2007 First Selectman campaign concluded before Mr. Da Ros became Mr.

Smith's employer, and Mr. Da Ros was aware of Mr. Smith's alignment with Ms. Morris long before he was elected to the position of First Selectman. Mr. Smith's claim of retaliation on the basis of political affiliation does not allege that the Defendants retaliated against him because of any discrete act or event. For those reasons, the mere temporal proximity of the conclusion of the 2007 First Selectman campaign and Mr. Smith's termination is not sufficient to support an inference that Mr. Da Ros fired Mr. Smith on account of Mr. Smith's support for Mr. Da Ros's political rival. *Cf. O'Connell v. Gorski*, 715 F. Supp. 1201, 1203 (W.D.N.Y. 1989) (noting that when a government employee claims First Amendment retaliation on the basis of political affiliation, his "initial burden [to show a causal connection] is not insignificant and he [cannot] rely solely on the fact that he was affiliated as a Republican fired by an incoming Democratic administration" (citing *Nekolny v. Painter*, 653 F.2d 1164, 1168 (7th Cir. 1981))).

Mr. Smith maintains that a jury nonetheless could infer a causal connection between his support for Ms. Morris and his termination as Facilities Manager because Mr. Da Ros initiated an adverse employment action against Mr. Smith "at the earliest possible opportunity" after taking office, when he extended Mr. Smith's probationary period of employment. Mem. in Opp'n [doc. # 39] at 24. However, as already discussed, the extension of Mr. Smith's probationary period did not constitute an adverse employment action, and thus Mr. Da Ros did not take adverse employment action against Mr. Smith "at the first opportunity." Indeed, the fact that Mr. Da Ros chose to extend Mr. Smith's probationary period rather than fire him at the first opportunity cuts against an inference of retaliation. *Cf. Mandell*, 316 F.3d at 384 (noting that "[i]t makes logical sense that if an employer wishes to retaliate by firing an employee, he is likely to do so soon after the event," but suggesting that a First Amendment retaliation claim based on a failure-to-promote might not require the same degree of temporal proximity).

While Mr. Smith speculates that Mr. Da Ros extended his probationary period in order to have more time to come up with a lawful pretext for terminating Mr. Smith, "a party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) (citation omitted). There is no evidence that Mr. Da Ros extended Mr. Smith's probationary period of employment because he lacked a lawful pretext to terminate Mr. Smith. At the same time, there is ample evidence that Mr. Smith's hiring was controversial, that Mr. Da Ros was aware of the controversy surrounding Mr. Smith's hiring when he took office, and that Mr. Da Ros had legitimate reasons to investigate the circumstances of Mr. Smith's hiring and Mr. Smith's qualifications for the job. Indeed, Mr. Smith himself states that Mr. Da Ros "was aware of the hysteria surrounding Morris' hiring of Smith," "the criticism of Smith's hiring," and "the RTM investigation into Smith's hiring." Pl.'s Local R. 56(a)2 Statement, Statement of Material Facts in Dispute [doc. # 38] ¶ 36. Those details do not favor Mr. Smith. To the contrary, the fact that Mr. Da Ros was aware that Mr. Smith's hiring had provoked criticism and that the RTM had investigated that hiring suggests that when Mr. Da Ros extended Mr. Smith's probationary period, he was simply acting as a responsible manager. Therefore, no reasonable jury could find on the basis of temporal proximity that Mr. Smith's political affiliation was a substantial or motivating factor in his termination.

**2.**

If Mr. Smith had presented some other tangible evidence that his political opposition to Mr. Da Ros led to retaliatory animus on Mr. Da Ros's part, that evidence, in combination with the timing of Mr. Smith's termination, might be enough to support an inference that Mr. Smith's political affiliation was a substantial or motivating factor in his termination. *See, e.g.*, *Lane v. City of Lafollette*, 490 F.3d 410, 420 (6th Cir. 2007) (finding that "[t]he temporal proximity

between [the defendant mayor's] assumption of power and [the plaintiff's] termination . . . bolster[ed]" the plaintiff's allegation that his termination was politically motivated, where there was evidence that (1) the defendant had threatened the plaintiff to convince him to cease supporting a political rival, and (2) the defendant had stated that his recommendation to terminate the plaintiff was political). However, even in combination with other evidence in the record, the timing of Mr. Smith's termination does not support an inference of retaliation on the basis of political affiliation.

It is undisputed that Mr. Da Ros was aware of Mr. Smith's criticisms of Mr. Da Ros's handling of the Tabor Property seizure and of Mr. Smith's political alignment with Ms. Morris for a year or more before Mr. Da Ros took office. By his own account, Mr. Smith engaged in more than one heated conversation with Mr. Da Ros about the Tabor Property matter. *See* Smith Dep. [doc. # 31-7] at 61:25-62:7; Pl.'s Local R. 56(a)2 Statement [doc. # 38] ¶ 20. Yet Mr. Smith has presented no evidence that in the months and years prior to Mr. Smith's hiring as Facilities Manager and the commencement of Mr. Da Ros's second term as First Selectman, Mr. Da Ros ever expressed any animus toward Mr. Smith as a result of Mr. Smith's criticisms. There also is no evidence that in the months and years prior to Mr. Smith's hiring as Facilities Manager and the commencement of Mr. Da Ros's second term as First Selectman, Mr. Da Ros ever demonstrated any animus toward Mr. Smith as a result of Mr. Smith's political alignment with Ms. Morris. Indeed, at his deposition, Mr. Smith stated that "based on the working relationship that [he] had with [Mr.] Da Ros before," he had believed that any possibility that his position as Facilities Manager was in jeopardy "would work itself out." Smith Dep. [doc. # 31-7] at 81:10-13.

On the record before the Court, no reasonable jury could find a logical nexus between the timing of Mr. Smith's discharge in late-December 2007 and Mr. Smith's political affiliation. To

the contrary, the logical and plausible explanation for the timing of Mr. Smith's discharge is that Mr. Smith's probationary period was nearing its end, and the results of the OSHA inspection of December 17 were consistent with complaints about Mr. Smith's performance that had accumulated over the course of that period. *See, e.g.*, *Anemone*, 629 F.3d at 120 (finding that the timing of the plaintiff's discipline "reflected the steady accumulation of misconduct on [the plaintiff's] part" rather than "an impermissible motive"); *Burkybile*, 411 F.3d at 314 (finding that where the defendant initiated disciplinary proceedings against the plaintiff "only after receiving [a] final investigative report" regarding the plaintiff's conduct, the passage of time and the defendant's actions precluded a showing that the plaintiff's speech was a substantial or motivating factor).

The purpose of a probationary period – under Town of Branford personnel regulations as well as in general – is to allow an employer to assess an employee's suitability before extending to him the privileges and protections of permanent employment. *See* Art. 6(a), Town of Branford Personnel R. and Procedures, Ex. 3-D to Mot. for Summary Judgment [doc. #31-15] at 16-17 (stating that "[the probationary period] shall be utilized . . . for closely observing the new . . . employee's work and conduct; for securing the most effective adjustment of a new employee to the position; and for rejecting any employee whose performance does not meet the required work standards"); Art. 6(d), *id.* at 17 (stating that the employee may be removed at any time during the probationary period if his "habits or dependability do not merit [his] continuance in the position"). It is logical that an employer, having received several complaints about the performance of a probationary employee approaching the end of his probationary period of employment, would seek to terminate the employee, rather than allow him to be promoted to permanent status with all its protections. An employer cannot be expected to give the benefit of the doubt to a probationary

employee whose work has been unsatisfactory, even if the deficiencies in the employee's work might not be serious enough, by themselves, to justify the discharge of a regular employee.

In Mr. Smith's case, Mr. Smith's extended probationary period was due to end on January 9, 2007. It is undisputed that there were several complaints about Mr. Smith's work, and that those complaints related to Mr. Smith's management of several different facilities and projects. Moreover, the complaints suggest a general pattern of trouble managing or supervising contractors, a fairly basic responsibility. That evidence is consistent with the statement in Mr. Smith's termination letter that Mr. Da Ros "ha[d] come to the conclusion that Ms. Morris's [employee] evaluation [of Mr. Smith] was not accurate and that [Mr. Smith's job performance as Facilities Manager [had] not been satisfactory." Letter from Anthony Da Ros to John Smith, Dec. 28, 2007, Ex. 3-L to Mot. for Summary Judgment [doc. # 31-23] at 2. Contrary to Mr. Smith's contention, no reasonable jury could conclude that Mr. Da Ros's "rationale for discharging [Mr.] Smith was pretext for impermissible discrimination." Pl.'s Local R. 56(a)2 Statement, Statement of Material Facts in Dispute, [doc. # 38] ¶ 50.

Although Mr. Smith maintains that the complaints regarding his work only came from a few department heads, and that his mistakes and failures were less serious than the Defendants represent, Mr. Smith's argument that he did not deserve to be fired is different from an argument that Mr. Da Ros's decision to fire him was based on an improper motive. *Cf. Woods v. Newburgh Enlarged City Sch. Dist.*, 288 F. App'x 757, 760 (2d Cir. 2008) (summary order) (holding that while plaintiff probationary employee's claim that she had misunderstood her superior's directive may have explained her poor judgment, it did not "demonstrate the probability of racial bias as the real reason for her termination"); *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985) (holding that, given the many "undisputed, documented examples of [the plaintiff's] inappropriate actions at

work," there was "ample basis for a trier of fact to find that [the plaintiff's] discharge was based . . . upon an honest belief that her job performance simply did not measure up to that required of probationary employees").   Mr. Smith quibbles with details of the complaints regarding his performance as Facilities Manager, attempts to lay blame for some of the problems on contractors and his subordinates, and downplays his own responsibility to manage and supervise contractors and other workers – but he does not dispute that Mr. Da Ros heard complaints about Mr. Smith's performance from several individuals, that the facilities Mr. Smith managed failed many elements of the OSHA inspection, or that Mr. Smith was responsible for OSHA compliance.

Mr. Smith's other arguments in support of his claim that the rationale for his termination was a pretext for unlawful retaliation are also unconvincing.   First, Mr. Smith notes that "although the letter extending [Mr.] Smith's probation indicated that [Mr. Da Ros] 'needed an additional amount of time to assess [Mr. Smith's] job performance,['] [Mr. Da Ros] never met with [Mr.] Smith prior to his discharge" and "never discussed any performance concerns with [Mr.] Smith prior to firing him."   Mem. in Opp'n [doc. # 39] at 26.   Second, Mr. Smith suggests that though the letter stated that Mr. Da Ros was extending Mr. Smith's probationary period in part to investigate the circumstances of Mr. Smith's hiring, a jury could infer that this statement and the reason given for Mr. Smith's discharge were both pretext because Mr. Da Ros testified that he did not ultimately conduct an investigation of the circumstances surrounding Mr. Smith's hiring or terminate Mr. Smith on that basis.   *Id.* at 12.   Third, Mr. Smith claims that in Mr. Da Ros's deposition, Mr. Da Ros "admitted . . . that the substantial amount of work performed by [Mr. Smith] that was outlined in [Mr.] Smith's Goals and Objectives accurately reflected his

productivity," and that "[Mr.] Da Ros never took this [productivity] into consideration."  *Id.* at 27.[9]

The fact that Mr. Da Ros failed to meet with Mr. Smith in person to discuss problems with his work performance does not suggest that Mr. Da Ros did not fire Mr. Smith on account of those problems.   Nor does the fact that Mr. Da Ros testified that he did not ultimately focus on the circumstances of Mr. Smith's hiring suggest that Mr. Smith was terminated in retaliation for his political affiliation.   If anything, Mr. Da Ros's testimony that he did not conduct an investigation of the circumstances surrounding Mr. Smith's hiring, but rather chose to focus on Mr. Smith's actual performance as Facilities Manager, suggests that Mr. Da Ros attempted to avoid an inquiry that might touch on political issues.   Finally, the fact that Mr. Da Ros recognized Mr. Smith's strengths as a Facilities Manager, including his "productivity," *id.* at 27, is not in tension with Mr. Da Ros's claim that he fired Mr. Smith, a probationary employee, because of the deficiencies in Mr. Smith's work.   Given Mr. Smith's probationary status, the results of the OSHA inspection, and the record of complaints about Mr. Smith's performance, the timing of Mr. Smith's termination – even in combination with other evidence – simply could not support a reasonable inference that the Plaintiff's political affiliation was a substantial or motivating factor in Mr. Da Ros's decision to discharge Mr. Smith.

**3.**

Although the timing of Mr. Smith's discharge does not support an inference of retaliation –

---

[9] Mr. Smith also claims that a jury could infer retaliation because of Defendants' "failure to follow [their] own personnel rules" in extending Mr. Smith's probationary period by 30 days.   Mem. in Opp'n [doc. # 39] at 25.   As already explained, there is absolutely no support for Mr. Smith's contention that the extension of his probationary period violated the town's personnel rules. In fact, the rules explicitly provide for such an extension. *See* Town of Branford Personnel R. and Procedures, Ex. 3-D to Mot. for Summary Judgment [doc. #31-15] at 17.

and indeed is consistent with evidence that defeats an inference of retaliation – Mr. Smith argues that a jury could infer that his political affiliation or protected speech was a substantial or motivating factor in his discharge on two other bases. First, he argues that a jury could find a causal connection between his protected conduct and his termination on the basis of differential treatment. *See* Mem. in Opp'n [doc. # 39] at 24-25, 34. Second, he argues that Mr. Da Ros's reference to "cronyism" in his inaugural address is direct evidence that Mr. Da Ros bore retaliatory animus toward Mr. Smith. *Id.* at 23. Neither argument is convincing.

### a.

Mr. Smith claims that a jury could infer that there was a causal connection between Mr. Smith's protected conduct and his termination on the basis of differential treatment. Evidence of differential treatment can support a claim of First Amendment retaliation. *See, e.g.*, *Gronowski*, 424 F.3d at 295 (observing that "[a] causal connection between [the plaintiff's] firing and the Mayor's dislike of her political activities [was] further substantiated by the disparate treatment [the plaintiff] received in the layoff and rehiring process" and finding it "noteworthy" that "in addition to [the plaintiff], two other individuals who supported a rival of the Mayor were not offered their old positions"). Mr. Smith makes two allegations in support of his differential treatment argument. First, Mr. Smith alleges that "[i]mmediately after [Mr.] Da Ros discharged [Mr.] Smith, he also discharged Leno Torrelli, another Cheryl Morris supporter." *See* Smith Aff. [doc. # 38-1] ¶ 46. Mr. Smith's affidavit does not explain the basis for his knowledge about Mr. Torrelli's termination, and beyond that allegation in Mr. Smith's affidavit, the record contains no evidence regarding the alleged discharge of Mr. Torrelli or Mr. Torrelli's political affiliations. The assertion in Mr. Smith's affidavit regarding Mr. Torrelli's alleged discharge is not sufficient to create a genuine issue of material fact regarding Mr. Smith's case. *See* Fed. R. Civ. P. 56(c)(4)

("An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004).

Second, Mr. Smith alleges that he was treated differently than other department heads. Specifically, he alleges that he was the only department head whom Mr. Da Ros did not meet with in person in his first month in office, and that other employees who made mistakes in their work received no discipline. *See* Mem. in Opp'n [doc. # 39] at 24. No reasonable jury could find that Mr. Smith was discharged on account of his political affiliation or protected speech, or even that Mr. Da Ros's explanation for Mr. Smith's discharge was a pretext, on the basis of Mr. Da Ros's failure to meet with Mr. Smith. As has already been noted, Mr. Smith was a probationary employee. There is no evidence that any other department head was a probationary employee at that time, and Mr. Da Ros had in fact extended Mr. Smith's probationary period on account of "questions and concerns regarding [Mr. Smith's] hiring," in order to assess Mr. Smith's qualifications and performance. Letter from Anthony Da Ros to John Smith, Nov. 26, 2007, Ex. 3-G to Mot. for Summary Judgment [doc. # 31-18] at 2. While the fact that Mr. Da Ros did not meet with Mr. Smith during a period when he met with all the other department heads supports an inference that Mr. Da Ros had a different attitude toward Mr. Smith than he did toward other department heads, there is no reason to conclude that Mr. Smith's support for Ms. Morris or criticisms of Mr. Da Ros, rather than Mr. Smith's probationary status or Mr. Da Ros's doubts about Mr. Smith's capabilities as a Facilities Manager, was the reason for that different attitude.

Mr. Smith's assertion that other department heads who were responsible for buildings with OSHA violations or who failed to call in their staffs to shovel snow were not disciplined, *see* Mem.

in Opp'n [doc. # 39] at 24, is also insufficient to support an inference of retaliation. First, Mr. Smith has not produced evidence – beyond his own bare assertions – that those department heads received no reprimands or other discipline for the OSHA violations or snow-shoveling failures. Second, Defendants do not claim that Mr. Smith was terminated solely because of the results of the OSHA inspection or his failure to call in staff to clear snow. If Mr. Smith had produced any evidence, beyond his unsupported assertions, that other employees performed equally deficiently but were not disciplined, the matter of whether those other employees were similarly situated to Mr. Smith might be a question of fact for a jury. *See Feingold v. New York*, 366 F.3d 138, 153 (2d Cir. 2004) (recognizing that the plaintiff, who was a probationary employee, was not similarly situated to permanent employees with respect to the conditions under which she could be terminated, but explaining that evidence that permanent employees of one race "were not disciplined *at all*" for misconduct like the plaintiff's would support an inference of discrimination (emphasis is original)). However, Mr. Smith has not produced any such evidence. Therefore, the Court finds that no reasonable jury could infer that any of Mr. Smith's protected conduct was a substantial or motivating factor in his termination on the basis that Mr. Smith was treated differently from similarly situated employees.

**b.**

The only supposed direct evidence Mr. Smith identifies in support of his allegation that his firing was politically motivated is Mr. Da Ros's promise in his inaugural address that there would be "no cronyism" in his administration. *See* Mem. in Opp'n [doc. # 39] at 23; Mark Zaretsky, *'Unk' DaRos is Back in Branford*, New Haven Register, Nov. 21, 2007, Ex. 3-N to Mot. for Summary

Judgment [doc. # 31-25] at 2.   To the extent that a jury could credit Mr. Smith's claim that this comment was directed at Mr. Smith, it does not aid his case.[10]

Webster's Dictionary defines "cronyism" as "partiality to cronies especially as evidenced in the appointment of political hangers-on to office without due regard being taken of their qualifications."   *Merriam-Webster's Third New International Dictionary Unabridged* (2002), available at http://www.mwu.eb.com/mwu.   A "crony" in turn is defined as "a familiar friend" or "old chum."   *Id.*   A promise of "no cronyism," then, is a promise that – perhaps unlike the previous administration – the Da Ros administration would not appoint friends to high level posts without due regard being taken of their qualifications.   It might also imply that Mr. Da Ros would try to reverse any cronyism practiced by the previous administration, perhaps by discharging individuals who had been appointed because of their political loyalty rather than their qualifications.   Nothing in the statement, though, suggests that Mr. Da Ros was intent on simply firing anyone who was politically affiliated with Ms. Morris or her administration.

Indeed, the Second Circuit has highlighted the difference between discharge on the basis of political affiliation, and discharge because an employer believes that the employee was wrongly hired on the basis of political loyalty, rather than qualifications.   As the Second Circuit explained in *Vezzetti v. Pellegrini*, 22 F.3d 483, it sometimes can be complicated to disentangle a Defendant's claim that he fired the plaintiff because the plaintiff had been the beneficiary of a patronage appointment, from the plaintiff's claim that he was fired because of his political affiliation.   In that case, the Second Circuit in fact found that the defendant's reference to political cronyism was

---

[10] Mr. Da Ros has testified that this comment was meant to convey only that he would not "be perceived as having cronyism in [his] administration period."   Da Ros Dep., Ex. 5 to Loc. R. 56(a)2 Statement [doc. # 38-2] at 221:13-16.   He stated that Ms. Morris's administration was perceived as having cronyism, but that he personally did not perceive Mr. Smith's hiring as cronyism. *Id.* at 221:17-25.

consistent with a conclusion that the defendant had engaged in political retaliation. *See id.* at 488. But *Vezzetti* does not support Mr. Smith's case.

In *Vezzetti,* the defendant Town Supervisor had campaigned in part on a specific promise to eliminate the plaintiff David Stuart's position, which the defendant characterized as a "brand new patronage job." *Id.* at 485. The Second Circuit vacated the district court's grant of summary judgment because there was evidence in the record that one of the defendants had told Mr. Stuart that he was being fired because of his party affiliation, and the only two non-policymaking positions eliminated by the new administration were those held by members of the Republican Party and Conservative Party. *Id.* at 488. However, the Second Circuit specifically noted that the defendant's "denunciation of [plaintiff's] job as a patronage position" before the election did not advance the plaintiff's First Amendment claim, "except insofar as [the defendant's position could] be shown to be pretextual." *Id.* at 484.

In this case, Mr. Smith does not claim that Mr. Da Ros denounced patronage appointments to create a pretext for political retaliation against otherwise qualified employees. Indeed, since Mr. Da Ros's inaugural address did not mention Mr. Smith or the Facilities Manager position or any other specific appointment, it would not have been a very effective means of preempting questions about a later decision to fire Mr. Smith in particular. Mr. Smith has not shown that either he or any other Morris appointees were replaced with political supporters of Mr. Da Ros, and Mr. Smith has offered no direct evidence that Mr. Da Ros's true motive in firing Mr. Smith was political retribution. Therefore, even if Mr. Da Ros's statement that he was going to rid the town government of cronyism was a reference to Mr. Smith – which is not apparent from the face of the text – no reasonable jury could conclude, on the basis of Mr. Da Ros's post-election speech, that

Mr. Da Ros fired Mr. Smith in retaliation for Mr. Smith's political affiliation with Ms. Morris, "as a sop to [Mr.] Smith's political opponents."   Mem. in Opp'n [doc. # 39] at 23.

## IV.

In addition to his federal claim, Mr. Smith brings a claim under Connecticut General Statutes § 31-51q.   Supplemental or pendent jurisdiction is a matter of discretion, not of right. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 715-26 (1966).   A court may decline to exercise supplemental jurisdiction when the court has dismissed all claims over which it has original jurisdiction.   *See* 28 U.S.C. § 1367(c)(3); *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006).   Because the Court grants Defendants' motion for summary judgment with regard to Mr. Smith's federal claim, the Court declines to exercise supplemental jurisdiction over Mr. Smith's remaining state law claim.   Should he wish to do so, Mr. Smith is free to raise his state law claim against the Defendants in the Connecticut Superior Court.

## V.

For the foregoing reasons, Defendants' Motion for Summary Judgment [doc. # 31] is GRANTED with respect to Mr. Smith's federal § 1983 claim.   Mr. Smith's state law claim is DISMISSED without prejudice to renewal in state court.   **The Clerk is directed to enter judgment for Defendants on Plaintiff's § 1983 claim and to close this file.**

IT IS SO ORDERED.

/s/ _____   Mark R. Kravitz _____
United States District Judge

**Dated at New Haven, Connecticut: February 25, 2011.**